# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JEREMY MCCOY, | ) | CASE NO. 1:17CV2105 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Jeremy McCoy, ("Plaintiff" or "McCoy"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be VACATED and the case REMANDED for further proceedings

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

consistent with this decision.

## I.    PROCEDURAL HISTORY

In June and July 2012, McCoy filed applications for POD, DIB, and SSI, alleging a disability onset date of October 1, 2011 and claiming he was disabled due to "herniated disc, pinched nerve, chronic pain, depression, and anxiety."  (Transcript ("Tr.") 12, 293, 299, 349.) The applications were denied initially and upon reconsideration, and McCoy requested a hearing before an administrative law judge ("ALJ").  (Tr. 12, 175-183, 184-190, 194-199, 200-204, 205.)

On May 15, 2014, an ALJ held a hearing, during which McCoy, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 70-102.)  On July 30, 2014, the ALJ issued a written decision finding McCoy was not disabled.  (Tr. 155-172.)  On August 31, 2015, the Appeals Council vacated and remanded for further proceedings.[2]  (Tr. 151-154.)

On remand, the ALJ conducted a second hearing, on April 27, 2016, during which McCoy, represented by counsel, and an impartial VE testified.  (Tr. 38-69.)  On June 16, 2016, the ALJ issued a written decision finding McCoy was not disabled.  (Tr. 12- 32.)  The ALJ's decision became final on August 11, 2017, when the Appeals Council declined further review. (Tr. 1-6.)

On October 6, 2017, McCoy filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 14, 15.)

---

[2]  Specifically, the Appeals Council remanded with instructions that the ALJ (1) obtain updated treatment records concerning McCoy's impairments; and (2) "obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Rulings 83-14 and 96-9p)."  (Tr. 153.)

McCoy asserts the following assignment of error:

> (1)     The administrative law judge erred in her analysis of treating physician opinion.  She failed to articulate good reasons for the weight she gave to the opinions of Treating Physician Patel.  She substituted her own opinion for that of a medical expert.  Her errors were not harmless.

(Doc. No. 13 at 15.)

## II.    EVIDENCE

### A.     Personal and Vocational Evidence

McCoy was born in November 1974 and was forty-one (41) years-old at the time of his administrative hearing, making him a "younger" person under social security regulations.  (Tr. 24.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  He has at least an eleventh grade education and is able to communicate in English.  (Tr. 24.)  He has past relevant work as a welder fitter (medium but performed as heavy, skilled) and recreation facility attendant (light but could have been performed as medium, semi-skilled).  (*Id.*)

### B.     Relevant Medical Evidence[3]

The record reflects McCoy underwent cervical disk displacement surgery in 2008.  (Tr. 432, 474.)  After the surgery, he continued to complain of "some low level of constant neck pain," which was managed with medication.  (Tr. 474.)

In December 2011, McCoy began experiencing mid-back pain.  (Tr. 474.)  On January 24, 2012, McCoy presented to the emergency room ("ER") with complaints of constant mid-back

---

[3]  The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  The Court further notes that, while McCoy suffers from a blood disorder, opioid dependence, and various mental health conditions (including depression and anxiety), these conditions are not directly relevant to McCoy's assignment of error.  Therefore, the Court will not discuss the medical evidence regarding these conditions in detail.

pain for the previous week.  (Tr. 452-454.)  He described the pain as "stabbing and burning" and rated it an 8 on a scale of 10.  (Tr. 452-454.)  On examination, McCoy was in moderate distress.  (Tr. 454.)  He had normal gait and station, normal strength and muscle tone, normal motor function, full range of motion in his extremities, no external signs of trauma, and no deformity or swelling.  (*Id*.)  The ER doctor did note, however, palpable mid-thoracic tenderness along McCoy's spine and surrounding muscles.  (*Id*.)  An x-ray of McCoy's thoracic spine was taken that date, which the ER doctor interpreted as showing "degenerative disc disease especially in the upper thoracic vertebrae."  (Tr. 455, 457, 469.)  McCoy was prescribed Percocet, Prednisone, Flexeril and Motrin 800 mg, and discharged home in stable condition.  (Tr. 455, 457.)

On February 2, 2012, McCoy established care with Sandeep Patel, M.D.  (Tr. 432-434.)  Dr. Patel noted McCoy "is known to have chronic pain syndrome, chronic cervical radiculopathy, [and] chronic back pain."  (Tr. 432.)  McCoy reported "his neck pain is not a problem right now," but did complain of radiculopathy symptoms in his hands.  (*Id*.)  On examination, Dr. Patel noted 5/5 grip strength, no myelopathic features of the upper or lower extremities, 5/5 muscle strength in his biceps and triceps, full shoulder range of motion, tenderness in the thoracic and cervical paraspinal regions, thoracic spinous process tenderness, limited neck range of motion, and normal reflexes.  (Tr. 432-433.)  Dr. Patel also noted McCoy's gait "seems to be steady."  (Tr. 433.)  He assessed mid back pain and chronic pain syndrome, and referred McCoy to pain management.  (*Id*.)

Shortly thereafter, on February 15, 2012, McCoy presented to pain management physician Sameh Yonan, M.D.  (Tr. 474-478.)  He complained of constant mild neck and mid-back pain, which he rated a 2 and 3 out of 10 respectively.  (Tr. 474.)  McCoy described his back

4

pain as "constant burning, achy, sharp, shooting, stabbing and throbbing" and stated it was worsened by getting in and out of the car, sitting, standing, and walking.  (*Id*.)  On examination, Dr. Yonan noted normal but painful range of motion in McCoy's neck; normal range of motion in his shoulders, elbows, hips, and knees; normal sensation; intact fine motor sensation; and negative straight leg raise.  (Tr. 476-477.)  He also found tenderness in McCoy's cervical and thoracic spines, as well as muscle spasms.  (*Id*.)  Dr. Yonan assessed pain in thoracic spine, thoracic or lumbosacral neuritis or radiculitis, mylagia and myositis, cervical disc displacement/herniation, and degeneration of cervical intervertebral disc.  (Tr. 477.)  He referred McCoy to physical therapy and prescribed Ultram, Lodine, Zanaflex, and Percocet.  (Tr. 478.)

On March 2, 2012, Dr. Yonan noted trigger points in McCoy's thoracic and lumbar spines.  (Tr. 478-479.)  McCoy thereafter underwent eight trigger point injections.  (*Id*.)  McCoy returned to Dr. Yonan on April 9, 2012, with complaints of continuing pain.  (Tr. 479.)  McCoy indicated the trigger point injections had "minimally helped" but reported his neck and back pain had increased in severity, rating it a 6 and 7 on a scale of 10 respectively.  (Tr. 479-480.)  On examination, McCoy was in mild distress but comfortable.  (Tr. 481.)  Dr. Yonan noted the same physical examination findings as in his previous visit.  (Tr. 481-482.)  He advised McCoy to continue his medications and physical therapy, and ordered an MRI of his thoracic spine.  (Tr. 483.)

McCoy underwent the MRI on April 18, 2012.  (Tr. 503.)  It showed (1) severe disc space loss and a small right disc herniation at T5-6 resulting in mild displacement of the spinal cord without significant spinal canal stenosis; (2) a small to moderate size right disc herniation at T6-7 impressing upon the spinal cord but resulting in no significant stenosis; (3) a small central disc

herniation at T7-8 resulting in no significant spinal canal or neuroforaminal stenosis; and (4) a

moderate size right disc hernation at T8-9, resulting in mild displacement of the spinal cord

reduced the diameter of the thecal sac to 6 mm.  (*Id.*)  The radiologist noted that "findings may

suggest diskitis possible co-existing mild anterior compression fracture of T5."  (*Id.*)

On April 23, 2012, McCoy returned to Dr. Patel for follow-up and reported his "pain is

decreasing."  (Tr. 430.)  Examination findings were normal.  (*Id.*)

McCoy presented to Dr. Yonan the following day.  (Tr. 484-487.)  He reported "some

increased pain" and stated the Percocet "is not helping a lot."  (Tr. 484.)  McCoy rated his neck

pain a 6 and his mid-back pain a 7 on a scale of 10.  (*Id.*)  Physical examination findings were the

same as his previous visits, including normal but painful range of motion in McCoy's neck;

normal range of motion in his shoulders, elbows, hips, and knees; normal sensation; intact fine

motor sensation; negative straight leg raise, and tenderness in the cervical and thoracic spines.

(Tr. 486-487.)  Dr. Yonan interpreted the MRI as showing possible disc bulge at C5-6 and

"questionable diskitis."  (Tr. 487.)  He advised McCoy to continue his medications and physical

therapy, and prescribed thoracic epidural steroid injections.  (*Id.*)  McCoy underwent the

injections on May 24, 2012 and June 11, 2012.  (Tr. 488-491.)

On June 17, 2012, McCoy presented to the ER with complaints that his back pain had

worsened after the injections.  (Tr. 439-443.)  He rated the pain a 10 on a scale of 10, and

indicated it was located in his left thoracic back.  (Tr. 441.)  On examination, McCoy was in

moderate distress, appeared uncomfortable and was laying on his right side.  (*Id.*)  He had normal

range of motion and no motor or sensory deficits.  (*Id.*)  McCoy was given IV pain medication

and discharged home feeling "slightly better."  (Tr. 442.)

The following day, McCoy returned to Dr. Yonan for follow-up.  (Tr. 492-495.)  McCoy complained of intractable back pain that was causing him "a lot of discomfort and headache." (Tr. 492.)  He rated his neck pain a 7 and his back pain an 8 on a scale of 10.  (*Id*.)  On examination, McCoy was in moderately severe pain.  (Tr. 494.)  Examination revealed normal but painful range of motion in McCoy's neck; normal range of motion in his shoulders, elbows, hips, and knees; normal sensation; intact fine motor sensation; negative straight leg raise, and tenderness in the cervical and thoracic spines.  (Tr. 494-495.)  Dr. Yonan was "not in favor to continue him on high dose narcotics but he claims he is in excruciating pain after the injection." (Tr. 496.)  He ordered another MRI of McCoy's thoracic spine to rule out infectious or other "destructive" process.  (*Id*.)

McCoy returned to Dr. Yonan on July 25, 2012.  (Tr. 496-500.)  Dr. Yonan noted McCoy had recently undergone another MRI of his thoracic spine which showed "no evidence of mass or infection" and "no changes" since his previous MRI in April 2012.[4]  (Tr. 496.)  Specifically, Dr. Yonan characterized the more recent MRI as showing "minimal [degenerative disc disease] and disc bulge, no nerve compression signs or infectious process."  (Tr. 500.)  McCoy indicated his neck pain was "less intense" and his mid-back pain was unchanged.  (Tr. 497.)  Examination findings were the same as McCoy's previous visit.  (Tr. 498-499.)  Dr. Yonan prescribed a Medrol Dose Pak and referred McCoy to a spinal surgeon.  (Tr. 500.)  He also noted he was "not in favor to increase his narcotics or medication needs at this time."  (*Id*.)

---

[4] The parties do not direct this Court's attention to the final results of this MRI, which McCoy apparently underwent on June 29, 2012.  Preliminary results indicated "no change" since the April 2012 MRI and noted "edematous signal remains in T5 and T6, with multifocal disc hernations T5/6- T8/9."  (Tr. 502.)

7

On August 8, 2012, McCoy returned to Dr. Patel for follow-up regarding his back pain. (Tr. 515-517.)  McCoy stated he wanted to change his pain management physician "due to the fact that [he] does not feel that Dr. Yonan listens to his concerns fully."  (Tr. 515.)  He complained that his pain is "still relatively uncontrolled," but denied any upper or lower extremity radicular symptoms.  (*Id*.)  On examination, Dr. Patel noted tenderness in the paraspinal region of the mid-thoracic spine with associated thoracic spinous process tenderness. (*Id*.)  McCoy's gait was described as steady.  (*Id*.)  Dr. Patel referred McCoy to another pain management physician, prescribed a Lidoderm patch, and ordered blood work.  (*Id*.)

McCoy returned to Dr. Patel on September 24, 2012.  (Tr. 506-514.)  He complained of neck, back and right elbow pain.  (Tr. 506.)  With regard to his back pain, McCoy stated it was "acutely worse than normal, making it very difficult to walk."  (*Id*.)  Dr. Patel noted tenderness in McCoy's right elbow and lower thoracic and upper lumbar spines, as well as reduced range of motion in his spine.  (*Id*.)  He found McCoy's gait was "steady albeit slow and somewhat wide-based to accommodate for the pain."  (*Id*.)  Dr. Patel prescribed a cane and referred McCoy to neurosurgery for a pain consultation.  (*Id*.)

On October 15, 2012, McCoy presented to neurosurgeon Domingo Gonzalez, M.D., for consultation regarding his mid-thoracic pain.  (Tr. 552-553.)  McCoy complained of constant back pain which "reaches up [to] a level of 8 or 9 . . . in spite of the pain medication he is taking."  (*Id*.)  He also reported "some sensory changes on his left upper extremity," but denied motor changes.  (*Id*.)  McCoy indicated he "has difficulty walking and has to use a cane to get some support."  (*Id*.)  On examination, Dr. Gonzalez found as follows:

> General appearance:  A normally developed male, in severe pain. * * *
> Examination of his posture reveals that he has to lean forward due to the pain.  He

8

> has difficulty  moving, and moves very slowly during the examination due to the pain.   There is pain on palpation over the spinous processes of the mid dorsal region.  There is no evidence of any atrophy.  The strength is difficult to evaluate because of the amount of pain he is having  involving the thorax  and both lower extremities.   Coordination is normal.   The sensory examination reveals some sensory changes on the thumb and index finger from the previous surgery on the left side.  The deep tendon reflexes are about 1.5+ on the right upper extremity. I cannot obtain the biceps or triceps reflex on the left and at the knee they are about 1+.  The ankle jerks are also 1+ with normal plantar response.  There is no clonus.

(Tr. 552.)  After reviewing the results of McCoy's MRIs, Dr. Gonzalez assessed "T5 and T6 lesion of undetermined etiology."  (Tr. 553.)  He ordered blood work and another MRI of McCoy's thoracic spine.  (*Id.*)

On November 7, 2012, Dr. Gonzalez noted McCoy had undergone an MRI which showed "the same lesions that were seen at T5 and T6."  (Tr. 551.)  He recommended a percutaneous needle biopsy, which showed "no evidence of any tumor, no multiple myeloma, [and] no evidence of any acid-fast bacteria."  (Tr. 543, 551.)  Blood work was "essentially normal."  (Tr. 543.)  On December 13, 2012, Dr. Gonzalez referred McCoy back to pain management "since we have nothing further at this point to offer the patient."  (*Id.*)

On January 9, 2013, McCoy presented to pain management physician Shrif Costandi, M.D.  (Tr. 595-600.)  McCoy complained of constant mid-back pain radiating to the anterior chest, which he rated an 8 on a scale of 10.  (Tr. 595.)  He also reported tingling/numbness in his left hand, worse at night.  (*Id.*)  McCoy stated his pain was exacerbated by sitting, walking, standing, prolonged laying flat, coughing, sneezing, and heat; and alleviated by fentanyl patches. (*Id.*)  Dr. Costandi noted McCoy's OARRS report "was reviewed and reveals aberrant drug related behavior such as multisourcing."  (Tr. 596.)  On examination, Dr. Costandi noted tenderness and limited range of motion in McCoy's cervical and lumbar spines, normal reflexes,

normal motor strength and tone, intact sensation, and normal gait.  (Tr. 597.)  He diagnosed

degenerative disc disease (thoracic) and thoracic neuritis, prescribed medication and physical

therapy, and referred McCoy to a spinal surgeon.  (Tr. 598.)

McCoy returned to Dr. Patel on February 14, 2013.  (Tr. 588-589.)  He complained of

back pain that was "debilitating to the point where it effects ambulation."  (*Id.*)  McCoy also

reported anxiety, depression, decreased appetite, and impaired sleep.  (*Id.*)  On examination, Dr.

Patel noted significant tenderness about the mid-thoracic spinal region, and steady gait "with the

use of a cane in his left hand."  (*Id.*)  He prescribed Percocet, and referred McCoy to pain

management and psychiatry.  (*Id.*)

On March 12, 2013, McCoy returned to Dr. Patel and reported he had not yet made

appointments with pain management, a spinal surgeon, or psychiatry.  (Tr. 584.)  McCoy

indicated his mood was "getting worse" and he complained of panic attacks, insomnia, poor

motivation, and poor sociability.  (*Id.*)  He also reported significant and worsening back pain in

the thoracic and lumbar spines.  (*Id.*)  On examination, Dr. Patel again noted significant

tenderness in McCoy's thoracic and lumbar regions, as well as steady gait "with the use of a

cane."  (*Id.*)

On June 5, 2013, McCoy presented to Dr. Patel and advised he had gone to the ER on

May 27, 2013 due to "falling and tripping, further worsening of his mid back pain."  (Tr. 582.)

He complained of severe mid back pain, which he rated a 10 on a scale of 10.  (*Id.*)  Examination

revealed tenderness in the mid-thoracic and cervical spines.  (*Id.*)

Later that month, on June 20, 2013, McCoy presented to Marisa Wynne, D.O., for

evaluation of his back pain.  (Tr. 1259-1262.)  He described his pain as "constant throbbing,

10

sharp, and stabbing at times," and rated it a 6 on a scale of 10.  (Tr. 1259.)  McCoy indicated "his duration for standing is 5 minutes, sitting is 5 minutes, and walking is 5 minutes."  (*Id.*)  He also complained of poor memory and severe depression.[5]  (Tr. 1260.)  On examination, Dr. Wynne noted restricted affect, pain behaviors, pain to palpation and increased muscle tension in McCoy's lower thoracic and lumbar spines, moderately painful range of motion in his lumbar spine.  (Tr. 1261.)  She also noted normal reflexes, normal sensation, and normal motor strength with the exception of decreased strength in his bilateral lower extremities with give-away weakness.  (*Id.*)  Dr. Wynne further noted McCoy walked with a cane.  (*Id.*)

Dr. Wynne indicated a June 2013 x-ray of McCoy's thoracic spine showed "no radiographic abnormality."  (*Id.*)  She assessed low back pain, thoracic back pain, chronic pain, depression, history of alcohol abuse, and degenerative disc disease (thoracic).  (Tr. 1262.)  Dr. Wynne issued a one-time prescription for Percocet but noted " I do not feel he is a candidate for chronic opioid therapy given his recent suicidal ideation as well as his history of alcohol abuse." (*Id.*)  She ordered an MRI and recommended a referral to the Cleveland Clinic's chronic pain rehabilitation program.  (*Id.*)

McCoy underwent an MRI of his thoracic spine on July 17, 2013.  (Tr. 1271-1273.)  This imaging revealed degenerative changes throughout the thoracic spine, "most notably . . . a compression deformity with loss of anterior height of the T5 vertebral body as well as a central disc extrusion causing mild to moderate compression of the cord at T8-T9."  (*Id.*)

On July 29, 2013, McCoy underwent a psychiatric evaluation with Byong Ahn, M.D.

---

[5] McCoy indicated he had recently been released from the hospital after having suicidal thoughts.  (Tr. 1260.)

11

(Tr. 541-542.)  He reported depression, hallucinations, racing thoughts, impaired sleep, and black out spells.  (*Id.*)  McCoy indicated he was taking Seroquel, Effexor, Trazodone and Neurontin, which he stated "appears to be working a little bit" but he was still having hallucinations.  (*Id.*)  On examination, Dr. Ahn found McCoy was alert and oriented with a restricted mood, moderate insight, and fair judgment.  (*Id.*)  He noted McCoy's back pain "appeared to bother him during this interview," and stated he looked depressed.  (*Id.*)  Dr. Ahn diagnosed "maybe major depression with psychotic feature," schizophrenia, and bipolar disorders; and assessed a Global Assessment of Functioning ("GAF")[6] of 40, indicating major impairment.  (*Id.*)

McCoy returned to Dr. Patel on July 30, 2013.  (Tr. 579-580.)  He reported he had been psychiatrically hospitalized from June 15 through June 19, 2013 due to major depressive disorder.  (*Id.*)  McCoy also complained of back pain.  (*Id.*)  On examination, Dr. Patel noted McCoy was in "moderate distress secondary to pain" and noted he "seems to be grimacing rather in an exaggerated form."  (*Id.*)  He found "paraspinal spasm of the thoracic spine with associated midline thoracic spinous process tenderness to palpation to minimal palpation at that."  (*Id.*)  Dr. Patel also noted McCoy's gait was steady.  (*Id.*)  He increased McCoy's medication.  (*Id.*)

On September 26, 2013, McCoy presented to Mark Woyshville, M.D., for treatment of

---

[6] The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  A score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

active opiate withdrawal.  (Tr. 757.)  He reported hearing muffled voices and seeing non-descript "figures that aren't there."  (*Id*.)  Dr. Woyshville prescribed Suboxone.  (*Id*.)  The record reflects McCoy returned to Dr. Woyshville several times in October 2013.  (Tr. 755-756, 753-754.)  He hallucinations eventually ceased and McCoy was continued on Suboxone. (*Id*.)

On October 10, 2013, McCoy returned to Dr. Ahn.  (Tr. 540.)  He reported "he still has a lot of aches and pains and he still has a lot of anxiety and nervousness but the hallucination of hearing voices has diminished greatly."  (*Id*.)  Dr. Ahn continued him on his medication.  (*Id*.)

On October 16, 2013, McCoy presented to neurosurgeons Osmond Wu, M.D., and James Anderson, M.D.  (Tr. 1245-1249.)  He reported back and neck pain with occasional numbness/tingling in his bilateral fourth and fifth fingers.  (*Id*.)  Examination revealed full motor strength in McCoy's upper and lower extremities, normal reflexes, negative Hoffman's, no clonus, and intact sensation except in a small band on the right side of McCoy's chest.  (*Id*.)  Dr. Wu found McCoy's "pain is disproportionate to imaging" and explained to him that "a large thoracic approach will likely not relieve his pain."  (Tr. 1248.)  Dr. Anderson agreed, noting McCoy "has an abnormal nonphysiologic exam regarding his sensory level and I think that this is not a surgical abnormality." (Tr. 1249.)  Both Dr. Wu and Dr. Anderson recommended referral to a pain management program.  (Tr. 1248, 1249.)

On October 29, 2013, McCoy returned to Dr. Woyshville. (Tr. 752.)  He reported an exacerbation of his back pain, "which was aggravated by his helping to push a stalled car."  (*Id*.)  McCoy indicated he no longer generally experienced hallucinations "although when he does hear/see them is when he is in 'high stress' and 'anxiety.'"  (*Id*.)  Dr. Woyshville continued to prescribed Suboxone.  (*Id.*)

13

On December 3, 2013, McCoy presented to Kutalba Tabbaa, M.D., with complaints of "continuous and chronic" cervical, thoracic, and lumbar pain.  (Tr. 1221-1223.)  Examination revealed normal reflexes, normal sensation, normal motor strength, normal gait, and normal fine motor coordination.  (*Id*.)  Dr. Tabbaa noted "positive Waddell's signs all over with severe exaggerated pain responses to any mild movement or simple touch anywhere."  (Tr. 1222.)  He assessed thoracic back pain, chronic pain, history of alcohol abuse, and degenerative disc disease (thoracic).  (*Id*.)  Dr. Tabbaa ordered thoracic epidural steroidal injections, which McCoy underwent on December 4 and 19, 2013.  (Tr. 1222, 1203-1204, 1196-1197.)  During the injection procedure on December 19, 2013, Dr. Tabbaa noted McCoy "always express[es] this excruciating pain and barely could move or stand. Severe allodynia and hyperalgesia that doesn't really correlate with his minimal radiological findings."  (Tr. 1197.)

On December 20, 2013, McCoy presented to certified nurse practitioner Todd Markowski, CNP.  (Tr. 1186-1189.)  On examination, Mr. Markowski noted McCoy was in mild distress and "unable to stand up straight."  (Tr. 1188.)  He found tenderness to palpation in McCoy's thoracic spine, but not in his lumbar or cervical spines.  (*Id*.)  Motor strength was 4/5 in McCoy's upper and lower extremities.  (*Id*.)  McCoy asked for Vicodin, but Mr. Markowski declined and gave him Prednisone instead.  (Tr. 1189.)

On February 5, 2014, McCoy returned to Dr. Woyshville with complaints of increased pain and "abysmal" sleep.  (Tr. 722.)  Dr. Woyshville continued him on his medication, including Suboxone, Trazodone, and Clonazepam.  (*Id*.)

Shortly thereafter, on February 18, 2014, McCoy presented to Dr. Patel for follow up after a recent ER visit for sinusitis and bronchitis.  (Tr. 576-578.)  McCoy complained of

significant back pain.  (*Id*.)  He indicated he had stopped taking Suboxone "due to the fact he feared he would be labeled an addict."  (*Id.*)  Dr. Patel advised he "would not be surprised" if McCoy had "some chemical dependency in the first place and this needs to be brought to the forefront but his activities of daily living are significantly hampered due to the pain."  (*Id.*)  Dr. Patel noted McCoy "has difficulty ambulating minimal distances," as well as difficulty bathing and grooming himself.  (*Id*)  He further indicated McCoy's back pain causes shooting pains which "at times results in buckling of his legs and occasional falls."  (*Id.*)  On examination, Dr. Patel noted reduced strength in McCoy's quadriceps, abnormal knee reflexes, and steady but "very slow" gait.  (*Id*.)

Later that month, on February 25, 2014, Dr. Patel completed a Physical Residual Functional Capacity ("RFC") form rearding McCoy's physical functional limitations.  (Tr. 533-538.)  He identified diagnoses of chronic pain syndrome, thoracic disc herniation (T5-6 and T8-9), thoracic compression fracture at T5; and thoracic spinal stenosis.  (Tr. 533.)  Dr. Patel described the nature of McCoy's pain as "severe requiring narcotic analgesics," and indicated his pain was precipitated by movement/overuse, static positions, and cold.  (Tr. 534.)  He stated McCoy was not a malingerer and that his impairments were reasonably consistent with his symptoms.  (*Id.*)

With regard to his functional limitations, Dr. Patel opined McCoy could (1) lift and carry less than 10 pounds occasionally and 10 pounds rarely;[7] (2) walk less than one city block without rest; (3) sit for 30 minutes at one time and for a total of about 4 hours in an 8 hour workday; and

---

[7] The form defined the term "rarely" as meaning 1% to 5% of an 8 hour workday; "occasionally" as meaning 6% to 33% of an 8 hour workday; and "frequently" as meaning 34% to 66% of an 8 hour workday.  (Tr. 537.)

(4) stand for 20 minutes at one time and stand/walk for a total of less than 2 hours in an 8 hour workday.  (Tr. 535-537.)  He further concluded McCoy would need to shift positions at will from sitting, standing or walking, and take unscheduled breaks "very often" during which he would need to lie down for approximately 15 to 20 minutes per break.  (Tr. 536.)  Dr. Patel indicated McCoy's legs would need to be elevated with prolonged sitting and, further, that he must use a cane or other assistive device while engaging in occasional standing/walking.  (*Id.*)  He opined McCoy could frequently engage in fine and gross manipulation bilaterally; occasionally climb stairs and raise his arms over shoulder level; and never twist, stoop (bend), crouch, or climb ladders.  (Tr. 537.)  Dr. Patel found McCoy could frequently tolerate dust, fumes, smoke exposure, wetness and humidity; occasionally tolerate heat, cold, and noise; and never operate machinery or work from heights.  (*Id*.)  He concluded McCoy's experience of symptoms was severe enough to frequently interfere with attention and concentration.  (Tr. 534.)  Finally, Dr. Patel found McCoy was incapable of tolerating even low stress jobs because his "pain at rest even is at least moderate degree."  (*Id*.)

The record reflects Dr. Tabbaa administered a thoracic epidural steroidal injection on February 27, 2014.  (Tr. 1179-1180.)  Several weeks later, on April 8, 2014, McCoy returned to Dr. Tabbaa with complaints of gradually worsening neck, shoulder, and lower back pain.  (Tr. 1172.)  Examination findings were normal, including normal gait.  (Tr. 1173.)  Dr. Tabbaa referred McCoy to a neurologist.  (*Id.*)

On April 30, 2014, McCoy returned to Dr. Patel for follow-up after an ER visit for right hip pain.  (Tr. 574-575.)  He complained of continued right hip pain, increased numbness and tingling in his fingertips, and paresthesias sensations down his right leg.  (*Id*.)  Examination

revealed right trochanteric tenderness, negative Tinel's, normal grip strength, abnormal knee reflexes, and "slow gait."  (*Id.*)  Dr. Patel referred McCoy to an orthopedist.  (*Id.*)

On May 8, 2014, McCoy presented to neurologist Mark Winkelman, M.D.  (Tr. 1163-1169.)  He complained of tingling and numbness in his hands and feet, mid-back pain, and neck pain.  (Tr. 1163-1164.)  McCoy also indicated he had fallen recently and hit his head.  (Tr. 1164.)  Examination revealed normal muscle tone and bulk, giveaway weakness in McCoy's right foot, reduced sensation in his fingers, absent sensation in his toes, normal reflexes, and a slow, painful gait.  (Tr. 1167.)  Dr. Winkelman ordered an EMG of McCoy's right limbs.  (*Id.*)

The record reflects McCoy returned to Dr. Patel on November 25, 2014 for treatment of a rash.  (Tr. 1575-1576.)  Neurological examination findings were normal.  (*Id.*)

On February 6, 2015, McCoy began treatment with pain management specialist Abdallah Kabbara, M.D.  (Tr. 1591-1592.)  He complained of neck and mid-back pain, rating it a 6 on a scale of 10.  (*Id.*)  McCoy stated his pain was aggravated by walking, standing for long periods of time, bending, and fully straightening up; and alleviated by laying down.  (*Id.*)  He indicated neither physical therapy or a TENS unit had been beneficial.  (*Id.*)  On examination, Dr. Kabbara noted McCoy was "walking in a normal gait" with normal sensation and cervical range of motion.  (*Id.*)  Dr. Kabbara prescribed Suboxone.  (*Id.*)

McCoy returned to Dr. Kabbara for numerous visits between February and May 2015.  (Tr. 1582-1590.)  On February 19, 2015, McCoy described an increase in his back pain, rating it a 7 on a scale of 10.  (Tr. 1589.)  Examination findings were normal.  (*Id.*)  On February 27, 2015, McCoy stated his pain was "better under control."  (Tr. 1587.)  Examination findings were normal and McCoy's ambulation was described as "baseline."  (*Id.*)  Dr. Kabbara increased

17

McCoy's Suboxone dosage.  (*Id.*)

On March 27, 2015, McCoy complained of numbness in his bilateral upper extremities. (Tr. 1586.)  Examination findings were normal.  (*Id.*)  Dr. Kabbara referred him for an EMG and nerve conduction study, and refilled his Suboxone.  (*Id.*)  McCoy returned the following month, on April 24, 2015, at which time examination findings were again normal.  (Tr. 1584.)  On May 22, 2015, Dr. Kabbara refilled McCoy's Suboxone prescription and added Mobic "to assist him with his chronic pain issues."  (Tr. 1582.)

On May 27, 2015, McCoy returned to Dr. Patel with complaints of increased left hip pain, mid and low back, and thigh pain.  (Tr. 1569-1570.)  Examination revealed left trochanteric tenderness but Dr. Patel noted McCoy "is sensitive to any degree of touch given his chronic pain syndrome."  (*Id.*)  Dr. Patel prescribed a trial of Medrol Dose Pak and advised him to follow up with Dr. Kabbara for his chronic pain issues.  (*Id.*)

On June 22, 2015, McCoy presented to Dr. Kabbara.  (Tr. 1581.)  He described the Suboxone as "beneficial" and did not look in any major distress during the examination.  (*Id.*)

McCoy returned to Dr. Patel on June 24, 2015, with complaints of right hip pain.  (Tr. 1566-1567.)  Dr. Patel diagnosed hip pain (left and right), likely bursitis.  (*Id.*)  He prescribed a trial of Prednisone.  (*Id.*)  Two months later, on August 14, 2015, McCoy presented to Dr. Patel for treatment of lightheadedness, diarrhea, and vomiting after a recent camping trip.  (Tr. 1563-1564.)  Examination findings were normal, and Dr. Patel assessed gastroenteritis, resolving.  (*Id.*)

McCoy returned to Dr. Kabbara for four (4) visits between September and December 2015.  (Tr. 1578-1580, 1906-1907.)  On October 8, 2015, McCoy complained of increased pain in his mid-thoracic and lumbar spines.  (Tr. 1579.)  Dr. Kabbara referred him to physical therapy.

(*Id.*)  On November 9, 2015, McCoy reported severe pain in his left lower extremity and stated he had recently been diagnosed with deep vein thrombosis (DVT).  (Tr. 1578.)  Examination findings were normal, and Dr. Kabbara advised McCoy to follow up with Dr. Patel regarding his DVT.  (*Id.*)  On December 11, 2015, McCoy stated the Suboxone was "beneficial."  (Tr. 1906.)  Examination findings were normal.  (Tr. 1906-1907.)

On December 22, 2015, McCoy returned to Dr. Patel with complaints of numbness and tingling in his feet.  (Tr. 1942-1943.)  On examination, Dr. Patel noted 1+ edema in McCoy's left lower leg.  (*Id.*)  He described McCoy's gait as "steady with use of a cane."  (*Id.*)  Dr. Patel ordered blood work and prescribed Gabapentin for his peripheral neuropathy.  (*Id.*)

McCoy presented to Dr. Kabbara on January 7, 2016.  (Tr. 1891-1892.)  He was not in "any major distress" and reported no new complaints.  (*Id.*)  Examination findings were normal, and his ambulation was described as "baseline."  (*Id.*)

On January 26, 2016, McCoy presented to the ER with complaints of lower back pain and bilateral leg numbness.  (Tr. 1912-1921.)  ER records reflects McCoy reported using an aid to ambulate.  (Tr. 1913.)  Examination revealed normal range of motion in his extremities, painful range of motion in his back, weakness in his bilateral lower extremities, and no motor or sensory deficits.  (Tr. 1915.)  An x-ray of McCoy's lumbar spine taken that date showed normal alignment, no acute fracture, and moderate degenerative disc volume loss at L5-S1.  (Tr. 1916, 1933.)  McCoy was discharged home in stable condition with a recommendation that he follow up with neurology.  (Tr. 1917.)

On February 3, 2016, McCoy returned to Dr. Patel with complaints of worsening balance and coordination, increased pain in his mid to lower back, numbness and tingling in his bilateral

19

lower extremities, and lower extremity pain.  (Tr. 1938-1939.)  Examination revealed 4/5 strength in his grip and biceps, 2-3/5 strength in his quadriceps, no muscle wasting or cachexia, and tenderness along his entire spine with minimal palpation.  (*Id.*)  Dr. Patel also noted McCoy was unable to walk on his heels and unable to balance himself once he is upright without holding on to the wall to walk.  (*Id.*)  He required the use of both hands to rise from a seated position and demonstrated abnormal knee jerk and bicep reflexes.  (*Id.*)  Dr. Patel assessed cauda equina syndrome by description, saddle anesthesia, peripheral neuropathy, paresthesias of the lower extremity, and ataxic gait.  (*Id.*)  He ordered blood work and a full MRI of McCoy's cervical, thoracic and lumbar spines.  (*Id.*)

McCoy underwent the MRIs on February 11, 2016.  (Tr. 1952-1956.)  The MRI of McCoy's cervical spine showed post-surgical changes at C6-C7 but was otherwise normal.  (Tr. 1952.)  The MRI of his thoracic spine showed (1) severe disc space narrowing at T5-T6 with chronic endplate changes; (2) disc herniation at T8-T9 which deforms the anterior aspect of thecal sac but does not cause significant canal stenosis; (3) minimal disc bulging at T6-T7 and T7-T8 without effect on the thecal sac.  (Tr. 1953.)  Finally, the MRI of McCoy's lumbar spine showed (1) minimal disc narrowing and mild disc bulging at L4-L5 with evidence of a right-sided annular tear causing minimal canal stenosis; and (2) minimal disc bulging at L5-S1 causing no effect on the thecal sac.  (Tr. 1955-1956.)

On February 26, 2016, McCoy presented to hematologist Asif Chaudhry, M.D., for evaluation of polycythemia.  (Tr. 1972-1974.)  Dr. Chaudhry noted symptoms including poor equilibrium with ataxia, chronic generalized pain, paresthesia of all four extremities, depression with anxiety, occasional migraine headaches, intermittent ankle swelling, intermittent dizziness,

and anxiety.  (*Id*.)  He advised McCoy his red and white blood cells were "quite high." (*Id*.)  Dr. Chaudhry ordered additional blood work and advised McCoy to return in several weeks.  (*Id*.)

On March 4, 2016, McCoy presented to neurologist Darshan Mahajan, M.D., for evaluation of his paresthesia.  (Tr. 1945-1948.)  He reported bilateral leg numbness, back pain, insomnia, poor appetite, and poor memory.  (Tr. 1945.)  On examination, Dr. Mahajan noted "poor posture habits," normal muscle mass, normal reflexes, normal coordination, and normal gait.  (Tr. 1946-1947.)  He also noted McCoy had tightness in his hamstring muscles and Achilles tendons, and that straight leg raising caused discomfort.  (*Id*.)  McCoy could do tandem walking with mild difficulty but had difficulty walking on his toes and heels and decreased proprioception in his left leg.  (*Id*.)  Dr. Mahahan ordered an EMG, sleep study, and blood work; and referred McCoy to physical and aqua therapy.  (*Id*.)

McCoy returned to Dr. Patel several days later, on March 8, 2016.  (Tr. 1934-1937.) Examination revealed a slow but steady gait and no myelopathic features of his bilateral upper or lower extremities.  (*Id*.)  Dr. Patel referred McCoy to a spinal surgeon.  (*Id*.)

On March 25, 2016, Dr. Patel completed a Physical RFC form regarding McCoy's physical functional limitations.  (Tr. 1957-1962.)  He identified diagnoses of cervical radiculopathy, thoracic disc herniation at T8-9, peripheral neuropathy, difficulty walking, lumbar disc bulge, and history of C6-7 fusion.  (Tr. 1957.)  Dr. Patel described the nature of McCoy's pain as "severe 8-10/10 pain every day for hours at a time."  (Tr. 1958.)  He stated McCoy was not a malingerer and that his impairments were reasonably consistent with his symptoms.  (*Id*.)

With regard to his functional limitations, Dr. Patel opined McCoy could (1) lift and carry

less than 10 pounds rarely and never 20 pounds or more;[8] (2) walk less than one city block without rest; (3) sit for 20-30 minutes at one time and for a total of about 4 hours in an 8 hour workday; and (4) stand for 10-15 minutes at one time and stand/walk for a total of about 2 hours in an 8 hour workday.  (Tr. 1959-1961.)  He further concluded McCoy would need to shift positions at will from sitting, standing or walking, and take unscheduled breaks "very often" during which he would need to lie down for approximately 20 minutes per break.  (Tr. 1960.)  Dr. Patel indicated McCoy's legs would need to be elevated with prolonged sitting and, further, that he must use a cane or other assistive device while engaging in occasional standing/walking.  (*Id.*)  He opined McCoy could frequently engage in fine and gross manipulation bilaterally; occasionally raise his arms over shoulder level; rarely twist, stoop (bend), and climb stairs; and never crouch or climb ladders.  (Tr. 1961.)  Dr. Patel found McCoy could frequently tolerate noise; occasionally tolerate heat, cold, dust, fumes, smoke exposure, and humidity; rarely tolerate wetness; and never operate machinery or work from heights.  (*Id.*)  He concluded McCoy's experience of symptoms was severe enough to often interfere with attention and concentration, but he was capable of tolerating low stress jobs.  (Tr. 1958.)  Finally, Dr. Patel found McCoy was likely to be absent from work more than 3 days per month as a result of his impairments or treatment.  (Tr. 1962.)

On April 5, 2016, McCoy returned to Dr. Chaudhry.  (Tr. 1968-1971.)  Based on the results of McCoy's blood work, Dr. Chaudhry determined he suffered from erythrocystosis with hypoxemia.  (Tr. 1969.)  He ordered phlebotomies every 3 months to achieve appropriate

---

[8] The form again defined the term "rarely" as meaning 1% to 5% of an 8 hour workday; "occasionally" as meaning 6% to 33% of an 8 hour workday; and "frequently" as meaning 34% to 66% of an 8 hour workday.  (Tr. 1961.)

22

hematrocrit levels. (Tr. 1970.)

On April 22, 2016, McCoy returned to neurosurgeon Dr. Gonzalez. (Tr. 1963-1966.) He reported "the pain now is getting to be more severe, involving his entire spine" to the point where "he can hardly move." (*Id*.) On examination, Dr. Gonzalez found as follows:

> The patient has difficulty moving, complaining of pain involving his entire spine and many of the joints like shoulders and hips. Examination of the cervical spine reveals some limitation of the cervical spine motion. There is also limitation of the thoracic and lumbar spine motion. The straight leg raising reproduced lumbar pain. There are no motor deficits on the examination. The sensory examination revealed no abnormality but it is noticeable that distally both hands and feet have a much cooler temperature and there is bluish discoloration as compared to the proximal portion of the extremities. Deep tendon reflexes are about 1.5+ , equal and symmetric, but he has absent bilateral ankle jerks. Plantar responses are normal. * * *

(Tr. 1964.) Dr. Gonzalez assessed chronic pain and polycythemia. (Tr. 1965.)

On May 27, 2016, McCoy presented to Dr. Mahajan with complaints of back, leg, ankle, and knee pain, as well as bilateral lower leg and fingertip numbness. (Tr. 1977-1979.) Dr. Mahajan noted McCoy's sleep study was consistent with obstructive sleep apnea, and his EMG showed carpal tunnel syndrome, worse on the right. (*Id.*) Examination findings were normal, including good balance and no focal weakness. (Tr. 1978.) Dr. Mahajan noted McCoy was "ambulating well." (*Id*.) He prescribed a CPAP machine for McCoy's sleep apnea, and indicated decompression would be necessary for his carpal tunnel syndrome. (Tr. 1979.)

## C. State Agency Reports

### 1. Physical Impairments

On September 13, 2012, state agency physician Robert Wysokinski, M.D., reviewed McCoy's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 109-111.) Dr. Wysokinski opined McCoy could lift 10 pounds occasionally

23

and frequently; stand and/or walk for a total of 2 hours in an 8 hour workday; and sit for a total of about 6 hours in an 8 hour work day.  (*Id.*)  He found McCoy could stand for 15 minutes maximum before needing to change positions.  (*Id.*)  Dr. Wysokinski further concluded McCoy could frequently use hand controls, climb ramps and stairs, balance, and kneel; occasionally stoop and crouch; and never crawl or climb ladders, ropes, or scaffolds.  (*Id.*)

With regard to McCoy's manipulative limitations, Dr. Wysokinski found McCoy could engage in occasional bilateral overhead reaching and frequent bilateral front and/or lateral reaching.  (*Id.*)  Finally, he found McCoy should avoid concentrated exposure to vibration, and avoid all exposure to unprotected heights, hazardous machinery, and commercial driving.[9]  (*Id.*)

### 2.    Mental Impairments

On October 18, 2012, McCoy underwent a psychological consultative examination with James Spindler, M.S.  (Tr. 525-531.)  McCoy reported he could not work because "I have severe back pain and depression and anxiety."  (Tr. 525.)  Dr. Spindler noted McCoy "walked with the aid of a cane, which he said was prescribed by his physician."  (Tr. 527.)  He reported a history of substance abuse but indicated he had been sober since February 2012.  (*Id.*)  McCoy described his activities of daily living, as follows:

> Jeremy said he is usually out of bed each morning by nine o'clock.  He starts his

---

[9]  On April 5, 2013, state agency physician Elizabeth Das, M.D., reviewed McCoy's medical and concluded there was insufficient evidence to evaluate his Physical RFC, explaining as follows: "The Clmt alleged worsening to his physical conditions.  He also alleged he had new treatment with a doctor and Cleveland Clinic.  Some information about his sources was missing as well as an updated medical release form.  This form was not returned and therefore updated treatment records were not requested.  There was also some treating source information that was not given to us to be able to contact Dr. Sertich.  Therefore there is insufficient evidence to evaluate his alleged worsening to his physical conditions."  (Tr. 144.)

day by having a soft drink and then changes his son's diaper. Claimant said he does not help with any of the house work, but does assist in caring for his son. Jeremy said he is not a member of any social organizations. He reports that he does not take naps during the day. He complains that he feels depressed at varying levels most of the time. Claimant said his only hobby is watching television. He has no close personal friends, other than family members. His fiance usually is the one that prepares supper for the family and later in the evening he usually returns to watching television until he retires for the night. Claimant said he does nothing special on the weekends.

(Tr. 529.)

On examination, McCoy was alert, oriented, and cooperative. (Tr. 527-528.) His speech and thought content were normal and he had "no apparent difficulty staying focused on the evaluation process." (Tr. 528.) His mood was mildly depressed, and Dr. Spindler noted McCoy was "somewhat lethargic" and "appeared to be physically tired." (*Id*.) McCoy reported his energy level was "generally poor" and stated he "feels depressed at varying levels 'most all the time.'" (*Id*.) Dr. Spindler did not observe any signs of anxiety during the evaluation, although McCoy reported that "sometimes he worries about things." (*Id*.) Dr. Spindler found McCoy appeared to be functioning in the average range of intelligence and had an adequate level of knowledge for most aspects of daily living. (*Id.*)

Dr. Spindler diagnosed depressive disorder, not otherwise specified; and alcohol dependence, with early full remission. (Tr. 529.) He assessed a GAF of 60, indicating moderate symptoms. (*Id.*) In terms of the four broad functional areas, Dr. Spindler found as follows:

> **Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions**.
> Based on clinical observations, his use of language and reported educational background, Jeremy appears to be functioning in the average range of intelligence. He seems capable of understanding, remembering and carrying out instructions in most job settings.
>
> **Describe the claimant's abilities and limitations in maintaining attention and**

25

**concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks**.

Jeremy did not appear to have any major difficulty staying focused during this interview. He was able to recall five of five objects after five minutes and accurately recited five digits forward and four digits backward. He appears to have the mental ability to maintain a level of attention and concentration that would be sufficient for most job settings.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in the work setting**.

Claimant reports that when he was employed most of the time he received good job performance ratings and had no major problem getting along with supervisors, but said he was sometimes at odds with coworkers, commenting, "I'm not good with people." He seems likely to respond appropriately to supervision and to at least tolerate coworkers.

**Describe claimant's abilities and limitations in responding appropriately to work pressures in a work setting**.

Based on clinical observations and what the claimant has told the examiner, he appears to be handling the current stressors in his life moderately well. It seems likely that Jeremy will respond appropriately to work pressures.

(Tr. 530-531.)

On November 26, 2012, state agency psychologist Bruce Goldsmith, Ph.D., reviewed McCoy's medical records and completed a Psychiatric Review Technique ("PRT"). (Tr. 107-108.) Dr. Goldsmith found McCoy had mild restrictions in his activities of daily living and mild difficulties in his social functioning and in maintaining concentration, persistence or pace. (Tr. 107-108.) He concluded as follows:

Claimant alleges disability due to anxiety and depression. He has had some substance abuse problems in the past but none currently. He is capable of understanding, remembering and carrying out job instructions. He has no major problems with paying attention. He can relate to others fairly well, and respond to work pressures appropriately.

(Tr. 108.)

On April 5, 2013, state agency psychologist Deryck Richardson, Ph.D., reviewed

26

McCoy's medical records and completed a PRT.  (Tr. 144-145.)  Dr. Richardson reached the

same conclusions as Dr. Goldsmith.  (*Id.*)

**D.      Hearing Testimony**

During the April 27, 2016 hearing, McCoy testified to the following:

- He has previous work experience as a welder/fitter.  (Tr. 44-45.)  In this job, he lifted "at least 75 pounds."  (*Id.*)  He has also worked at the front desk of a health club doing maintenance, stocking, and cashier duties.  (Tr. 47.)

- He suffers from back pain, numbness in his hand and legs, and neuropathy in his feet.  (Tr. 48, 54, 55.)  He was also diagnosed with a blood disorder that at least one doctor believed might be increasing the severity of his pain.  (Tr. 57.)

- His back pain is constant throughout the day.  (Tr. 54.)  It worsens with activity, movement, lifting, and turning the wrong way.  (*Id.*)  His most comfortable position is "lounging" or laying down.  (*Id.*)  He has trouble concentrating during the day because of his pain.  (Tr. 56.)

- He had a cane at the hearing.  (Tr. 47.)  His family doctor, Dr. Patel, prescribed a cane for him in 2011 or 2012.  (*Id.*)  Prior to November 2015, he could get around the house without a cane by leaning on tables, counter tops, etc.  (Tr. 48-50.)  Now, however, he uses his cane "pretty much all the time."  (Tr. 48.)  He explained that "things are getting a lot worse and my legs are just giving out on me and getting really wobbly."  (*Id.*)  He needs a cane both for walking and for balance.  (Tr. 50.)  He sometimes falls and, in fact, recently fell in his bathroom and bruised his ribs.  (Tr. 59.)

- He does not drive due to his leg numbness.  (Tr. 48.)  It has been a year and a half since he drove regularly.  (*Id.*)  He needs help showering and bathing.  (Tr. 49.)  He cannot do chores for an extended period of time.  (*Id.*)  Due to his constant back pain, he needs to lay down two or three times per day for 30 to 60 minutes each time.  (Tr. 50-51.)

- He can sit upright for 30 minutes and can stand for 45 minutes before needing to change position.  (Tr. 54-55.)  He can walk less than a block.  (*Id.*)  It is difficult for him to switch positions from sitting to standing.  (Tr. 53-54.)  He uses a cane to change positions and needs a few minutes to allow his legs to acclimate.  (*Id.*)

- Because of the numbness in his fingertips, he drops things frequently.  (Tr. 56.)  He can usually manage to use a fork and knife but has dropped silverware on occasion.  (*Id.*)  He is unable to open a jar or bottle without help.  (*Id.*)

27

- He went camping recently in Pennsylvania but his daughter drove to the campsite and he did not hike or fish.  (Tr. 52-53.)  He slept on a queen size air mattress and sat around the campsite talking to friends.  (*Id.*)  He split wood once when the heat was turned off in his home.  (Tr. 51-52.)  It was just one piece and took only a few minutes to split it with a hammer and wedge.  (*Id.*)

The VE testified McCoy had past work as a welder/fitter (medium performed as heavy, skilled, SVP 7) and recreation facility attendant (light possibly performed as medium, semi-skilled, SVP 3).  (Tr. 61.)  The ALJ then posed the following hypothetical question:

 If you could consider a person of the claimant's age, education, and past relevant work experience who could occasionally lift objects weighing up to ten pounds, stand and walk for intervals of 15 minutes at a time for a total of two hours a day, sit six hours a day with the ability to use bilateral upper extremities frequently to operate hand controls, the ability to reach in any direction, including overhead with bilateral upper extremities frequently.  The ability to climb ramps and stairs frequently, climb ladders, ropes and scaffolds never, frequently balance, occasionally stoop, frequently kneel, occasionally crouch, never crawl.

He would have to avoid concentrated exposure to vibration and avoid all exposure to hazards defined as industrial machinery, unprotected heights, commercial driving and similar things.  Would that individual be able to perform the type of work the claimant performed in the past?

(Tr. 61-62.)

The VE testified the hypothetical individual would not be able to perform McCoy's past work as a welder/fitter or recreation facility attendant but would be able to perform other representative jobs in the economy, such as cashier II (light, unskilled, SVP 2), production worker (taper printed circuit layout) (sedentary, unskilled, SVP 2), and inspector (touch up screener printed circuit board) (sedentary, unskilled, SVP 2).[10]  (Tr. 62.)

---

[10] The VE explained, however, that the available jobs in these positions would be less for individuals that needed to remain seated.  She estimated that about six percent of the unskilled cashier jobs are sedentary, noting that represented about 200,000 jobs in the national economy.  (Tr. 62.)  With regard to the production worker position, the VE

The ALJ then asked the VE to assume the same hypothetical with the additional limitation that the individual would need to use a cane for standing and walking.  (Tr. 63.)  The VE testified the hypothetical individual would be able to perform the cashier II job, but not the production and inspector positions "predominantly because I find that often the cane is not wanted in this setting just to get to the workstation."  (*Id*.)  However, the VE testified the individual would be able to perform other representative jobs such as telephone solicitor (sedentary, semi-skilled, SVP 3) and appointment clerk (sedentary, semi-skilled, SVP 3).  (*Id*.)

McCoy's counsel then posed a series of hypothetical questions.  First, counsel asked the VE whether "somebody [who] has to lay down for two to three hours during the workday in addition to any regularly scheduled breaks, would they be able to sustain any jobs?"  (Tr. 64.)  The VE stated there would not be any jobs for such an individual.  (*Id*.)

Counsel then asked the VE to consider the ALJ's second hypothetical with the following additional limitation:

> Q:     Now, what if we changed it to 30 minutes of standing based on his testimony that he needs to kind of move around to kind of stretch out his back that after 30 minutes of sitting, you would need 15 minutes of walking?
>
> A:     Then, I believe you're not going to do the jobs that I mentioned because if you're walking away from the workstation, just walking, then you're not working.
>
> Q:     Would there be any other jobs that somebody could do?
>
> A:     If you're walking with a cane and you're walking for four hours.

---

stated about ten percent of these jobs are sedentary, representing about 20,000 jobs in the national economy.  (*Id*.)  Finally, with regard to the inspector position, the VE stated that about five percent of these jobs are sedentary, representing about 23,000 jobs in the national economy. (Tr. 62-63.)

Q:    But, not for -- it's only 15 minutes of walking for every half an hour of sitting.

A:    Okay.  Fifteen minutes of walking after every half hour of sitting?

Q:    Correct.

A:    No, there's probably -- you're probably off task about 25 percent then if you're walking at that point.

Q:    Then, what if we just went back to the second hypothetical and just said every 30 minutes they would need to be able to shift positions for a few minutes.  Not leaving the  workstation, not necessarily -- 30 minutes of standing, 30 minutes of sitting.  After 30 minutes of sitting, they need to adjust.

A:    That would actually be easier than the hypothetical you gave me of standing 30 minutes.

Q:    Right.  So, they would be able to do those jobs?

A:    Yes.

(Tr. 65-66.)  Finally, counsel asked the VE to consider the following hypothetical:

Q:    And then, the last hypothetical I had was based on the RFC by his treating doctor at 6-F.  They said that walk less than one block, sit 30 minutes at a time for a total of four hours, stand 20 minutes at a time for a total of four hours, must be able to shift positions at will, would need at least two unscheduled work breaks of 15 to 20 minutes and also must use a cane for standing or walking.

                                    * * *

A:    I would say there are no jobs.  You don't have a full- time work schedule.

(Tr. 67.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason

30

of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of

31

age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the

claimant's impairment or combination of impairments does not prevent him from doing his past

relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).

For the fifth and final step, even if the claimant's impairment does prevent him from doing his

past relevant work, if other work exists in the national economy that the claimant can perform,

the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, McCoy was insured on his alleged disability onset date, October 1, 2011, and

remained insured through December 31, 2016, his date last insured ("DLI.") (Tr. 12, 14.)

Therefore, in order to be entitled to POD and DIB, McCoy must establish a continuous twelve

month period of disability commencing between these dates. Any discontinuity in the twelve

month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th

Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.     SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant meets the insured status requirements of the Social Security Act
        through December 31, 2016.

2.      The claimant has not engaged in substantial gainful activity since October 1,
        2011, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.)

3.      The claimant has the following severe impairments: DDD (disorders of back-
        discogenic and degenerative) and osteoarthritis and allied disorders (20 CFR
        404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments
        that meets or medically equals the severity of one of the listed impairments
        in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,
        404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the

claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), limited to lifting and carrying 10 pounds occasionally; with the ability to stand and/or walk for intervals of 15 minutes at a time for a total [of] 2 hours in an 8 hour work day; with the ability to sit about 6 hours in an 8 hour work day; limited to the use of bilateral upper extremities frequently to operate hand controls; with the ability to reach in any direction including overhead with bilateral upper extremities frequently; with the ability to frequently climb ramps and stairs; precluded from climbing ladders, ropes, and scaffolds; with the ability to frequently balance; with the ability to occasionally stoop; with the ability [to] frequently kneel; with the ability to occasionally crouch; precluded from crawling; precluded from concentrated exposure to vibration; and precluded from all exposure to hazards (defined as industrial machinery, unprotected heights, commercial driving, etc.)

6.      The claimant has past relevant work as a welder fitter (DOT 819.361-010; medium but performed at heavy level; skilled) and recreation facility attendant (DOT 341.367-010; light but could have been performed at the medium level; semi-skilled).  The vocational expert testified that the claimant would be unable to perform this past relevant work with the above limitations.

7.      The claimant was born on November * * * , 1974 and was 36 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant alleged having completed the 11th grade in 1992 in addition to welding training in 1997 (Exhibit 3E).  The claimant reported to Dr. Ahn that he dropped out in the 12th grade but got his GED (Exhibit 7F/3).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12-26.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the

34

Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### *Treating Physician Patel*

McCoy argues the ALJ erred in her evaluation of Dr. Patel's February 2014 and March

35

2016 opinions.  (Doc. No. 13 at 15-21.)  First, McCoy asserts remand is required because the ALJ "expressly considered only whether to give [Dr. Patel's] opinions . . . controlling weight" and failed to weigh the opinions in light of the factors set forth in 20 C.F.R. § 404.1527(c). Second, McCoy maintains the ALJ erroneously concluded that his use of a cane is "not medically required."  (*Id.* at 18.)  He asserts the ALJ failed to cite any evidence to support this conclusion and, further, failed to acknowledge the fact that Dr. Patel prescribed McCoy a cane in September 2012 and indicated he required it for "occasional standing/walking."  (*Id.* at 19.)  McCoy argues that, in so doing, the ALJ "played doctor" by improperly substituting her own opinion for that of Dr. Patel.  (*Id.* at 19-20.)  Finally, McCoy argues the ALJ failed entirely to address the numerous other limitations set forth in Dr. Patel's opinions, including that McCoy could only sit for a total of four hours in a workday, would need frequent unscheduled breaks during the day in order to lie down, and would likely be absent more than three days per month.  (*Id.* at 21.)

The Commissioner argues the ALJ "provided good reasons supported by substantial evidence for her consideration of the medical opinions and for her conclusion that Plaintiff's allegations of disability were inconsistent with the weight of the evidence."  (Doc. No. 14 at 13.) Although not argued by McCoy, the Commissioner first engages in a lengthy discussion of the ALJ's evaluation of McCoy's credibility, arguing the ALJ properly rejected his allegations of disabling pain in light of normal physical examination findings and evidence of "symptom exaggeration."  (*Id.* at 13-17.)  The Commissioner then argues the ALJ "appropriately considered and discredited" Dr. Patel's opinions.  (*Id.* at 17.)  She maintains the ALJ fully considered all of Dr. Patel's proposed limitations and offered several good reasons for rejecting them, including that (1) Dr. Patel failed to explain the basis for his "extreme assessments;" and (2) his opinions

36

were inconsistent with the record evidence of "apparent symptom exaggeration, benign clinical observations, and medical imaging." (*Id.* at 17-18.) The Commissioner also argues the ALJ provided "good reasons" for rejecting Dr. Patel's opinion that McCoy would require a cane, including evidence "he often walked with a normal gait and had normal strength, sensation, and reflexes in his extremities." (*Id.* at 19.) Lastly, and although not argued by McCoy, the Commissioner argues remand is not required because "substantial evidence supports the ALJ's determination of Plaintiff's RFC."[11] (*Id.* at 20.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[12] However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009)

---

[11] The Court is somewhat puzzled by the Commissioner's brief. As noted above, McCoy did not argue remand is required because the ALJ's RFC is not supported by substantial evidence, nor did he challenge the ALJ's credibility evaluation. Rather, McCoy's brief is limited to the legal issue of whether the ALJ sufficiently articulated "good reasons" for rejecting Dr. Patel's February 2014 and March 2016 opinions. As the Commissioner is well aware, the legal issue of whether an ALJ satisfied the"good reasons" requirement in discounting a treating physician opinion, is separate and distinct from whether an ALJ's RFC and credibility assessments are supported by substantial evidence. As McCoy does not argue the ALJ's RFC and credibility findings are not supported by substantial evidence, the Court will not address those issues herein.

[12] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

(quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[13]  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[14]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered

---

[13]  SSR 96-2p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017.  *See* SSR 96-2p, 2017 WL 3928298 at *1.

[14]  Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id.* It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1

39

(11th Cir. 1982).

As noted *supra*, Dr. Patel submitted two opinions regarding McCoy's physical functional limitations.  The first, dated February 25, 2014, identified diagnoses of chronic pain syndrome, thoracic disc herniation (T5-6 and T8-9), thoracic compression fracture at T5, and thoracic spinal stenosis.  (Tr. 533.)  Dr. Patel described the nature of McCoy's pain as "severe requiring narcotic analgesics," and indicated his pain was precipitated by movement/overuse, static positions, and cold.  (Tr. 534.)  He stated McCoy was not a malingerer and that his impairments were reasonably consistent with his symptoms.  (*Id*.)

With regard to his functional limitations, Dr. Patel opined McCoy could (1) lift and carry less than 10 pounds occasionally and 10 pounds rarely; (2) walk less than one city block without rest; (3) sit for 30 minutes at one time and for a total of about 4 hours in an 8 hour workday; and (4) stand for 20 minutes at one time and stand/walk for a total of less than 2 hours in an 8 hour workday.  (Tr. 535-537.)  He further concluded McCoy would need to shift positions at will from sitting, standing or walking, and take unscheduled breaks "very often" during which he would need to lie down for approximately 15 to 20 minutes per break.  (Tr. 536.)  Dr. Patel indicated McCoy's legs would need to be elevated with prolonged sitting and, further, that he must use a cane or other assistive device while engaging in occasional standing/walking.  (*Id.*)  He opined McCoy could frequently engage in fine and gross manipulation bilaterally; occasionally climb stairs and raise his arms over shoulder level; and never twist, stoop (bend), crouch, or climb ladders.  (Tr. 537.)  Dr. Patel found McCoy could frequently tolerate dust, fumes, smoke exposure, wetness and humidity; occasionally tolerate heat, cold, and noise; and never operate machinery or work from heights.  (*Id.*)  He concluded McCoy's experience of

symptoms was severe enough to frequently interfere with attention and concentration.  (Tr. 534.)

Finally, Dr. Patel found McCoy was incapable of tolerating even low stress jobs because his

"pain at rest even is at least moderate degree."  (*Id*.)

In his March 25, 2016 opinion, Dr. Patel identified diagnoses of cervical radiculopathy,

thoracic disc herniation at T8-9, peripheral neuropathy, difficulty walking, lumbar disc bulge,

and history of C6-7 fusion.  (Tr. 1957.)  Dr. Patel described the nature of McCoy's pain as

"severe 8-10/10 pain every day for hours at a time."  (Tr. 1958.)  He again stated McCoy was not

a malingerer and that his impairments were reasonably consistent with his symptoms.  (*Id*.)

Dr. Patel opined McCoy could (1) lift and carry less than 10 pounds rarely and never 20

pounds or more; (2) walk less than one city block without rest; (3) sit for 20-30 minutes at one

time and for a total of about 4 hours in an 8 hour workday; and (4) stand for 10-15 minutes at one

time and stand/walk for a total of about 2 hours in an 8 hour workday.  (Tr. 1959-1961.)  He

further concluded McCoy would need to shift positions at will from sitting, standing or walking,

and take unscheduled breaks "very often" during which he would need to lie down for

approximately 20 minutes per break.  (Tr. 1960.)  Dr. Patel again indicated McCoy's legs would

need to be elevated with prolonged sitting and, further, that he must use a cane or other assistive

device while engaging in occasional standing/walking.  (*Id.*)  He opined McCoy could frequently

engage in fine and gross manipulation bilaterally; occasionally raise his arms over shoulder level;

rarely twist, stoop (bend), and climb stairs; and never crouch, or climb ladders.  (Tr. 1961.)  Dr.

Patel found McCoy could frequently tolerate noise; occasionally tolerate heat, cold, dust, fumes,

smoke exposure, and humidity; rarely tolerate wetness, and never operate machinery or work

from heights.  (*Id.*)  He concluded McCoy's experience of symptoms was severe enough to often

41

interfere with attention and concentration, but he was capable of tolerating low stress jobs. (Tr. 1958.) Finally, Dr. Patel found McCoy was likely to be absent from work more than 3 days per month as a result of his impairments or treatment. (Tr. 1962.)

> The ALJ evaluated Dr. Patel's opinions as follows:
>
> S. Patel, M.D., on February 25, 2014, diagnosed chronic pain syndrome; thoracic disc herniation TS-6 and T8-9; thoracic compression fracture TS; and thoracic spinal stenosis (Exhibit 6F). He said the claimant had at least moderate pain at rest (Exhibit 6F). He opined the claimant was incapable of even low stress jobs (Exhibit 6F). He said the claimant was limited to occasional lift and carry less than 10 pounds and rarely 10 pounds (Exhibit 6F). He stated that the claimant could stand/walk less than 2 hours and sit about 4 hours (Exhibit 6F). The claimant needed to take unscheduled breaks to lie down for 15 to 20 minutes and would require elevating the leg with prolonged sitting. He responded yes to a requirement for the claimant to use a cane or other assistive device. **Dr. Patel offered no clinical data supporting this opinion (Exhibit 6F). Dr. Patel also did not explain why the claimant would need a cane and the record as a whole does not support a need for an assistive ambulatory device. Therefore, the undersigned does not find this conclusion to be persuasive.**
>
> S. Patel, M.D., on March 25, 2016, diagnosed cervical radiculopathy; thoracic disc herniation T8-9; peripheral neuropathy; difficulty walking; lumbar disc bulge; and history of C6-7 fusion (Exhibit 26F). This time, he stated that the claimant was capable of low stress jobs. He said the claimant was limited to rarely lift and carry less than 10 pounds. He stated that the claimant could stand/walk about 2 hours and sit about 4 hours (Exhibit 26F).
>
> **Consequently, the undersigned does not give controlling weight to Dr. Patel's assessments. In reviewing the totality of the evidence, including a slow wide gait, the undersigned finds that use of cane is not warranted. Furthermore, more recent neurological evaluation conducted by Dr. Patel [sic][15] on May 27, 2016 found the claimant's strength to be well maintained, his balance was good and the claimant was noted to be ambulating well. There was no mention of the use or need of an ambulatory aid (Exhibit 29F).**

(Tr. 20) (emphasis added). The ALJ assessed the following RFC:

---

[15] The record reflects it was Dr. Mahajan, and not Dr. Patel, that examined McCoy on May 27, 2016. As noted previously, Dr. Mahajan found McCoy had good balance and no focal weakness and was "ambulating well." (Tr. 1977-1978.)

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), limited to lifting and carrying 10 pounds occasionally; with the ability to stand and/or walk for intervals of 15 minutes at a time for a total [of] 2 hours in an 8 hour work day; with the ability to sit about 6 hours in an 8 hour work day; limited to the use of bilateral upper extremities frequently to operate hand controls; with the ability to reach in any direction including overhead with bilateral upper extremities frequently; with the ability to frequently climb ramps and stairs; precluded from climbing ladders, ropes, and scaffolds; with the ability to frequently balance; with the ability to occasionally stoop; with the ability [to] frequently kneel; with the ability to occasionally crouch; precluded from crawling; precluded from concentrated exposure to vibration; and precluded from all exposure to hazards (defined as industrial machinery, unprotected heights, commercial driving, etc.)

(Tr. 17-18.)

As an initial matter, it is undisputed Dr. Patel was McCoy's treating physician at the time he authored both his February 2014 and March 2016 opinions.[16]  It is also undisputed that, although restrictive, the RFC is nonetheless inconsistent with Dr. Patel's opinions in numerous respects.  Specifically, the RFC does not accommodate Dr. Patel's opinions that McCoy (1) could sit for 20 to 30 minutes at one time and for a total of four hours; (2) could lift no more than less than 10 pounds occasionally; (3) would need to be able to shift positions at will from sitting, standing or walking; (4) would need unscheduled breaks "very often" to lie down for approximately 15 to 20 minutes per break; (5) would need to elevate his legs; and (6) would need to use a cane or other assistive device while engaging in occasional standing/walking.  (Tr. 533-538, 1957-1962.)  The RFC also rejects Dr. Patel's March 2016 opinion that McCoy was

---

[16] Indeed, the record reflects that, between February 2012 and Dr. Patel's February 2014 opinion, McCoy presented to Dr. Patel on at least nine (9) occasions.  (Tr. 432-434, 430, 515-517, 506-514, 588-589, 584, 582, 579-580, 576-578.)  Between March 2014 and Dr. Patel's March 2016 opinion, McCoy presented to Dr. Patel on another eight (8) occasions.  (Tr. 574-575, 1575-1576, 1569-1570, 1566-1567, 1563-1564, 1942-1943, 1938-1939, 1934-1937.)

likely to be absent from work more than three (3) days per month as a result of his impairments or treatment. (Tr. 1962.) In addition, the RFC rejects many of Dr. Patel's postural limitations, including that McCoy could rarely or never stoop, never crouch, occasionally climb stairs, and occasionally engage in overhead reaching. (Tr. 537, 1961.) Finally, the RFC does not reflect Dr. Patel's assessments that McCoy had a reduced capacity to tolerate heat, cold, dust, smoke, fumes, noise, wetness and humidity. (*Id*.)

For the following reasons, the Court finds the ALJ failed to articulate "good reasons" for rejecting Dr. Patel's opinions. As an initial matter, while the ALJ indicated she did not accord "controlling weight" to Dr. Patel's opinions, the ALJ fails to clearly articulate how much weight (if any) she did accord to these opinions. As the Sixth Circuit has explained, "[i]f the ALJ does not accord controlling weight to a treating physician, *the ALJ must still determine how much weight is appropriate* by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (emphasis added). *See also Hernandez v. Comm'r of Soc. Sec.,* 644 Fed. Appx. 468, 473 (6th Cir. March 17, 2016) ("An ALJ must also determine what weight – if not controlling– to give the treating physician's opinion" by applying the factors set forth in 20 C.F.R. § 404.1527); *Kalmbach v. Comm'r of Soc. Sec.,* 409 Fed. Appx. 852, 860 (6th Cir. Jan. 7, 2011) (finding that "[e]ven if the ALJ does not give controlling weight to a treating physician's opinion, he must still consider how much weight to give it" using the factors set forth in 20 CFR § 404.1527); *Friend v. Comm'r of Soc. Sec*., 375 Fed. Appx. 543, 550 (6th Cir. April 28, 2010) (same); *Roush v. Barnhart*, 326 F.Supp.2d 858,

867 (S.D. Ohio 2004) ("Even where the ALJ determines not to give the opinions of a treating physician 'controlling' weight, Social Security regulations and rules nonetheless require the ALJ to determine and articulate the amount of weight given to the opinions.")  Indeed, federal courts have not hesitated to remand where an ALJ fails to specify the amount of weight accorded a treating physician opinion and discuss the regulatory factors set forth in 20 CFR § 404.1527.  *See e.g. Quattlebaum v. Comm'r of Soc. Sec.,* 850 F.Supp.2d 763, 771 (S.D. Ohio 2011) (remanding where "the ALJ's decision does not reflect an analysis of the regulatory factors or an indication of the weight he actually accorded to [the treating physician opinion]."); *Harmon v. Astrue*, 2011 WL 834138 at * 9 (N.D. Ohio Feb. 8, 2011), *report and recommendation adopted at,* 2011 WL 825710 (N.D. Ohio Mar. 4, 2011) (remanding where ALJ failed to articulate the weight given to the treating source opinion and failed to consider all of the appropriate factors in weighing the opinion); *Saunders v. Comm'r of Soc. Sec.,* 2015 WL 4450656 at * 6 (S.D. Ohio July 20, 2015), *report and recommendation adopted at,* 2015 WL 5582315 (S.D. Ohio Sept. 23, 2015) (remanding where ALJ failed to articulate the weight assigned to treating physician opinion); *Horn v. Comm'r of Soc. Sec*., 2014 WL 5107598 at * 7 (S.D. Ohio Oct. 10, 2014) (finding that ""[w]hile it is implicitly clear that the ALJ rejected virtually all of [the treating source]'s opinions, remand is required because he failed to explicitly state what weight he was giving to [those] opinions.").

Although a comparison of the RFC in the instant case and Dr. Patel's opinions indicates the ALJ rejected most (if not all) of Dr. Patel's proposed limitations, nowhere in the decision does the ALJ specify the amount of weight given to either Dr. Patel's February 2014 or March 2016 opinions.  As a result, "any reader of [the ALJ decision] would be left wondering whether

the ALJ accorded some weight, little weight, or no weight to [Dr. Patel]'s opinion[s], and would be clueless as the reasons underlying the accorded level of weight.*" Lambert ex rel. Lambert v. Comm'r of Soc. Sec*., 886 F.Supp.2d 671, 685 (S.D. Ohio 2012). *See also Shlimon v. Comm'r of Social Security*, 2013 WL 3285136 at *13 (E.D. Mich. June 28, 2013)("[T]he ALJ did not explicitly assign a weight to Dr. Steppe's opinion, which, of course, makes it difficult for the Court to carry out its duty of determining whether substantial evidence supports the weight assigned"). Moreover, compounding her error, the ALJ in the instant case failed to consider many of the factors set forth in 20 C.F.R. §§ 404.1527 and 416.927. Specifically, the ALJ offered no discussion of the length of the treatment relationship, the frequency of the examinations, the nature and extent of the treatment relationship, or other factors such as Dr. Patel's familiarity with other information in the McCoy's treatment record. The ALJ's failure to either articulate the amount of weight given to Dr. Patel's opinions or discuss many of the factors set forth in 20 CFR § 404.1527 runs contrary to Social Security regulations and rules and inhibits proper judicial review. *See e.g, Blakley,* 581 F.3d at 406. *Quattlebaum,* 850 F.Supp.2d at 771; *Harmon*, 2011 WL 834138 at * 9.

Additionally, while the ALJ offered some reasons for rejecting Dr. Patel's opinion that McCoy would need to use a cane, the decision failed entirely to address the majority of the other specific functional limitations set forth in Dr. Patel's opinions. Specifically, the ALJ fails to sufficiently discuss the basis for her implicit rejection of Dr. Patel's opinion McCoy could sit for only 20 to 30 minutes at one time and for a total of four hours. Nor does the decision explain the ALJ's reasons for rejecting Dr. Patel's opinions that McCoy would need to be able to shift positions at will from sitting, standing or walking; would need unscheduled breaks "very often"

46

to lie down for approximately 15 to 20 minutes per break; would need to elevate his legs; and would likely to be absent from work more than 3 days per month as a result of his impairments or treatment.

The Commissioner suggests the ALJ satisfied the "good reasons" rule with respect to these proposed limitations by stating that "Dr. Patel offered no clinical data supporting this opinion." (Tr. 20.)  This argument is without merit.  As an initial matter, Dr. Patel identified several diagnoses in his opinions, including chronic pain syndrome, thoracic disc herniation, thoracic spinal stenosis, thoracic disc herniation, cervical radiculopathy, peripheral neuropathy, and lumbar disc bulge.  (Tr. 533, 1957.)  Additionally, Dr. Patel identified the specific locations of McCoy's pain (his lumbosacral, cervical, and thoracic spines), described the severity of McCoy's pain, and identified several factors that precipitated it.  (Tr. 533-534, 1957-1958.)  Moreover, the Court notes the administrative record contains numerous treatment records from McCoy's many visits to Dr. Patel.  (Tr. 432-434, 430, 515-517, 506-514, 588-589, 584, 582, 579-580, 576-578, 574-575, 1575-1576, 1569-1570, 1566-1567, 1563-1564, 1942-1943, 1938-1939, 1934-1937.)  Dr. Patel's treatment records not only documented McCoy's persistent pain complaints but also contained numerous abnormal physical examination findings, including tenderness in McCoy's thoracic and cervical paraspinal regions, thoracic spinous tenderness, limited neck range of motion, reduced spinal range of motion, slow and wide-based gait, difficulty ambulating, shooting pains "at times resulting in buckling of his legs and occasional falls," reduced quadricep strength, abnormal reflexes, trochanteric tenderness, edema, and difficulty balancing.  (*Id*.)  In light of the above, the Court finds the ALJ's unexplained reference to the lack of "clinical data" is without merit.

47

The Commissioner nonetheless argues remand is not required because, reading the decision as a whole, the ALJ's discussion of the medical evidence provides support for his rejection of Dr. Patel's opinions.  The Court rejects this argument.  While the ALJ recited some of the medical evidence in the decision, she failed to offer any *explanation* for her apparent conclusion that Dr. Patel's opinions regarding the specific functional limitations noted above were inconsistent with that evidence.  This is significant because the medical evidence appears capable of supporting serious functional limitations.  Specifically, imaging of McCoy's thoracic spine showed severe disc space loss, multiple disc herniations, and compression deformity with loss of anterior height.  (Tr. 503, 502, 1271-1273, 1953.)  Imaging of his lumbar spine showed disc bulging with evidence of a right-sided annular tear.  (Tr. 1955-1956.)  Moreover, while the record contains normal physical examination findings, it also contains a great deal of abnormal findings as well, including those identified in Dr. Patel's treatment notes (discussed above) as well as the treatment notes of many of his other physicians.  For example, McCoy's treatment records reflect that:

- In February, March, April and June 2012, Dr. Yonan noted painful range of motion in McCoy's neck, and tenderness and muscle spasms in McCoy's cervical and thoracic spines;

- In October 2012, Dr. Gonzalez noted pain to palpation, abnormal reflexes, and some sensory changes;

- In January 2013, Dr. Costandi noted tenderness and limited range of motion in McCoy's cervical and lumbar spines;

- In June 2013, Dr. Wynne noted pain to palpation in McCoy's thoracic and lumbar spines, painful range of motion in lumbar spine, and decreased strength in bilateral lower extremities with give-away weakness;

- In December 2013, CNP Markowski noted tenderness to palpation in McCoy's thoracic spine and reduced motor strength in his upper and lower

48

extremities; and

- In May 2014, Dr. Winkelman noted give-away weakness in McCoy's right foot, reduced sensation in his fingers, absent sensation in his toes, and a slow, painful gait.

(Tr. 476-477, 481-482, 486-487, 494-495, 552, 596-597, 1188, 1261, 1167.)  The ALJ fails to provide any explanation as to why the above medical evidence is inconsistent with Dr. Patel's February 2014 and March 2016 opinions.

As courts within this District have held, an ALJ's recitation of the medical evidence "does not cure the failure to offer any meaningful analysis as to why the opinions of treating physicians were rejected."  *Blackburn v. Colvin*, 2013 WL 3967282 at * 7 (N.D. Ohio July 31, 2013).  Simply put, this Court cannot conduct a meaningful review and conclude that good reasons have been set forth for rejecting a treating physician's opinion where an ALJ recites some of the pertinent evidence of record and follows that recitation with an unexplained conclusion that said opinion is inconsistent with the medical record.  *See Blackburn*, 2013 WL 3977282 at * 7; *Cassels v. Comm'r of Soc. Sec.*, 2016 WL 3097150 at * 4 (S.D. Ohio June 3, 2016) ("The ALJ, for example, 'does not offer any explanation for his conclusion' that 'the treating physician's opinions were inconsistent with the medical evidence,' which is enough by itself for error.") (quoting *Blackburn*, 2013 WL 3977282 at * 7); *Sacks v. Colvin*, 2016 WL 1085381 at * 5 (S.D. Ohio March 21, 2016) ("[A]lthough the ALJ made a general statement about inconsistencies between Dr. Bhatia's opnions and the 'medical evidence of record,' it was just that - a general statement devoid of any specific reference to any portion of the medical evidence.  Such conclusory statements do not provide the claimant with any ability to understand their content, nor do they provide a reviewing court with the ability to decide if the ALJ

49

correctly or incorrectly assessed those claimed inconsistencies.").

The Commissioner also asserts the ALJ properly rejected Dr. Patel's opinions in light of McCoy's "apparent symptom exaggeration, benign clinical observations, and medical imaging." (Doc. No. 14. at 17-18.) However, the ALJ did not articulate these as reasons for rejecting Dr. Patel's opinions regarding the proposed limitations noted above and the Commissioner cannot cure a deficient opinion by offering explanations never offered by the ALJ. As courts within this District have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration." *See, e.g., Blackburn*, 2013 WL 3967282 at *8; *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012).

Finally, the Commissioner argues any deficiencies in the ALJ's evaluation of Dr. Patel's opinions should be considered harmless, noting "'so long as the [ALJ's] decision 'permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion,' no remand is necessary." (Doc. No. 14 at 18) (citing *Francis v. Comm'r of Soc. Sec*., 414 Fed. Appx. 802 (6th Cir. March 16, 2011)). This argument is without merit. As noted above, the ALJ's decision does not make clear the weight given Dr. Patel's opinions and, further, fails to discuss many of the factors set forth in 20 CFR § 404.1527. Moreover, the ALJ fails to meaningfully address the majority of the specific functional limitations set forth in Dr. Patel's opinions or sufficiently articulate the basis for her implicit decision to reject them. Lastly, the VE testified that no work would be available for a hypothetical individual with the limitations set forth in Dr. Patel's opinions. (Tr. 67.) Under

these circumstances, the Court cannot find that the ALJ decision permits either McCoy or the Court a "clear understanding of the reasons" for discounting Dr. Patel's opinions.

In sum, the Court finds the ALJ's decision fails to set forth "good reasons" for discounting Dr. Patel's February 2014 and March 2016 opinions. Moreover, this portion of the decision is so conclusory and devoid of explanation that it deprives this Court of the ability to conduct a meaningful review. Accordingly, the Court recommends a remand is necessary, thereby affording the ALJ the opportunity to sufficiently and more thoroughly address the physical functional limitations assessed by Dr. Patel.[17]

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and this case REMANDED for further proceedings consistent with this decision.

s/Jonathan D. Greenberg
Jonathan D. Greenberg
United States Magistrate Judge

Date: September 5, 2018

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

---

[17] As this matter is being remanded for the reasons discussed above, the Court will not address McCoy's argument that the ALJ "substituted her own judgment" for that of Dr. Patel with respect to McCoy's need for a cane.  However, on remand, the ALJ should more clearly explain the basis for her conclusion that McCoy's cane is not "medically necessary."